PACIFIC TRIAL ATTORNEYS
A Professional Corporation
Scott J. Ferrell, Bar No. 202091
sferrell@pacifictrialattorneys.com
Victoria C. Knowles, Bar No. 277231
vknowles@pacifictrialattorneys.com
4100 Newport Place Drive, Ste. 800
Newport Beach, CA 92660
Tel: (949) 706-6464
Fax: (949) 706-6469

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RUTH MARTIN, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ONNIT LABS, INC., a Delaware corporation; and DOES 1 through 10, inclusive,<br><br>Defendants. | Case No. 2:23-cv-03737-FWS-KES<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE CONSUMER LEGAL REMEDIES ACT** |

# I.   INTRODUCTION

**Defendant sells a supplement known as "Alpha Brain" (the "Product") by falsely claiming that it will support "memory, focus, and cognitive processing speed." In reality, Defendant's claims have been proven false by overwhelming scientific evidence.**

# II.   JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1332 of the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because: (i) there are 100 or more class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (iii) there is at least minimal diversity because at least one Plaintiff and Defendant are citizens of different states. Indeed, based upon the information available to Plaintiff, there are believed to be thousands of class members, each entitled to actual damages, restitution of their purchasing price, statutory damages, and punitive damages, thus making the amount in controversy exceeding $5,000,0000 exclusive of interests and costs. In addition, Plaintiff is entitled to prevailing plaintiff attorneys' fees under section 1780(e) of the California Civil Code. This Court has jurisdiction over all causes of action asserted herein.

2. Pursuant to 28 U.S.C. § 1391, venue is proper because a substantial part of the acts and events giving rise to the claims occurred in this District.

3.      Defendant is subject to jurisdiction under California's "long-arm" statute found at California Code of Civil Procedure Section 410.10 because the exercise of jurisdiction over Defendant is not "inconsistent with the Constitution of this state or the United States." Indeed, Plaintiff believes that Defendant generates a minimum of eight percent of its national website sales to Californians, such that the website "is the equivalent of a physical store in California." Since this case involves false representations made in part on Defendant's website, California courts can "properly exercise personal jurisdiction" over the Defendant in accordance with the Court of Appeal opinion in *Thurston v. Fairfield Collectibles of Georgia*, 53 Cal. App. 5th 1231, 1235 (2020).

### III.     PARTIES

4.      Plaintiff is an individual and a consumer advocate who is a resident of California.

5.      Defendant is a Delaware company that develops, manufactures, promotes, markets, distributes and/or sells the Product to consumers nationwide. The above-named Defendant, along with its affiliates and agents, are collectively referred to as "Defendants."

6.      The true names and capacities of the Defendants sued herein as DOE Defendants are currently unknown to Plaintiff, who therefore sues such Defendants by fictitious names. Plaintiff will amend the First Amended Complaint to reflect the true names of the DOE Defendants when such identities become known.

### IV.     FACTS

7.      Plaintiff is a consumer advocate with dual motivations for purchasing the Product. First, Plaintiff was genuinely interested in using the product as directed and obtaining the promised results, and Plaintiff's desire to obtain the advertised benefits of the Product was a substantial, meaningful factor in Plaintiff's decision to purchase the product. Second, Plaintiff is a "tester" who works to ensure that companies abide by the obligations imposed by California law. As someone who advances important public

interests at the risk of vile personal attacks, Plaintiff should be "praised rather than vilified." *Murray v. GMAC Mortgage Corp.*, 434 F.3d 948, 954 (7th Cir. 2006).

8. The front and back labels of the Product are as follows:




9. The accompanying marketing materials of the Product found at www.onnit.com/alphabrain/ claim: "The ultimate way to get 'in the zone,' Alpha BRAIN supports memory, focus, and cognitive processing speed."

10. Defendant's efficacy claims are not simply unsubstantiated, they have been proven to false by the overwhelming weight of scientific evidence. Numerous scientific studies conclusively prove that the ingredients in the Product, Phosphatdylserine ("PS") and L-Alpha glycerylphosphorylcholine ("Alpha GPC"), do not and cannot the promised benefits.

11. By way of example only, a scientific article, Nicholas Barringer, *et al.*, Impact of a purported nootropic supplementation on measures of mood, stress, and marksmanship performance in U.S. active duty soldiers, *Journal of the International Society of Sports Nutrition* (2018) (the "Alpha Brain study"), which is attached hereto as **Exhibit "1"**, found no statistically significant difference between subjects who

consumed a nootropic[1] supplement product known as Alpha Brain for 30 days versus a placebo for a variety of criteria including "hits," "initial reaction time in seconds," mean reaction time in seconds," "or distance from center mass in centimeters." (Ex. 1 at pg. 3 of 6.) The Alpha Brain study states that a "key ingredient in Alpha Brain" is PS. (Ex. 1 at pg. 2 of 6.) In addition, the Alpha Brain study states that "another component of Alpha Brain" is L-alpha-glycerphosporycholine (Alpha GPC)." *Id.* Thus, Alpha Brain contains two of the same ingredients that are similarly contained in the Product. That overlap in ingredients is significant. The Alpha Brain study stated, "In this study, we found that 30 days of Alpha Brain nootropic supplement consumption did not have any statistically significant effects on measures of marksmanship performance …." (Ex. 1 at pg. 4 of 6.) The Alpha Brain study stated, "Despite following a dosing pattern (3 times daily) and daily amount (1972.5 g) consistent with investigations suggesting potential ergogenic benefit [1, 18] we did not see improvement in the number of target hits, distance from center of mass, or reaction time during a prone supported marksmanship task … in rested, otherwise healthy Soldiers." (Ex. 1 at pg. 4 of 6.) The Alpha Brain study concluded, "30 days of dosing with the Alpha Brain supplement at 3 pills per day or 1972.5 mg per day dosing had no appreciable effect on marksmanship … in otherwise well rested Soldiers engaged in a basic marksmanship test." (Ex. 1 at pg. 5 of 6.) The Alpha Brain study stated, "The main purpose of this study was to determine if a commercially available nootropic would improve marksmanship performance, ***specifically accuracy and target acquisition time***." (Ex. 1 at pg. 2 of 6) (emphasis added). Needless to say, "accuracy" in marksmanship performance is relevant here as is "target acquisition time."

12. Notably, the aforementioned Alpha Brain study was funded "by a grant from Onnit LLC," (Ex. 1 at pg. 5 of 6.) In disclosing the author's competing interests,

---

[1] A leading online dictionary defines "nootropic" to mean "a substance that enhances cognition and memory and facilitates learning." https://www.merriam-webster.com/dictionary/nootropic (last visited July 5, 2023). A nootropic is a dietary supplement that helps support certain brain functions, including memory, mental speed, and focus.

the lead author freely disclosed that Onnit LLC is "the maker of the product tested." *Id.* In other words, the maker of Alpha Brain provided a grant to have its own product tested for its alleged nootropic properties presumably with the expectation of using the results of the Alpha Brain study to bolster its marketing of its Alpha Brain product, but the (unexpected) results of such testing did not support the hypothesis that it would have such properties making the Alpha Brain study useless to bolster Onnit LLC's marketing of its Alpha Brain product. Plaintiff is informed and believes, and thereon alleges, that Onnit LLC and Defendant are corporate affiliates of each other.

13. A published review article exists addressing a study conducted on patients with dementia with PS intervention. In Yindee van Os, *et al.*, Cognitive Interventions in Older Persons: Do They Change the Functioning of the Brain?, *BioMed Research International* (2015) (the "Os article"), a copy of which is attached hereto as **Exhibit "2"** and is available for downloading from the Internet at: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4637036/ (last visited July 5, 2023), the authors conducted a systematic literature search of articles published from 1993 to March 2012, which met the following criteria: "(i)the study had to involve the healthy elderly, the healthy elderly with cognitive complaints, and the elderly with Mild Cognitive Impairment or elderly with dementia; (ii) the study had to contain a cognitive intervention; (iii) the study had comparisons of brain activity measurements before and after the intervention; (iv) the study had a full report available; (v) the articles were in English." (Os article at 2.) "A total of 19 studies met all inclusion criteria." *Id.* Amongst the 19 studies that met such criteria was a certain study of dementia patients with PS intervention, W.-D. Heiss, *et al.,* "Long-term effects of phosphatidylserine, pyritinol, and cognitive training in Alzheimer's disease. A neuropsychological, EEG, and PET investigation," *Dementia*, vol. 5, no. 2, pp. 88–98, 1994 (the "Heiss study"). (Os article at 4, 8, 10-11, 14.) The Heiss study was a randomized, controlled trial involving four different groups of 80 total participants with Alzheimer's disease with different interventions for six months. (Os article at 10.) "The content of their

intervention was different. The 17 participants received social support (group 1), 18 participants received cognitive training twice a week (group 2), 18 participants received a combination of the cognitive training and the drug pyritinol that is used for symptomatic treatment of [Alzheimer's disease] (group 3), and finally 18 participants received cognitive training and *the dietary supplement phosphatidylserine*." *Id.* (emphasis added). According to the Os article, "In weeks 8 and 16, the group that received cognitive training and phosphatidylserine scored significantly better on orientation than the other intervention groups. *This effect was no longer present at the end of the intervention*." *Id.* at 11 (emphasis added). The Os article elsewhere described the Heiss study as follows: "According to one study [25], *the changes in neuropsychological measurements and brain activity were temporary and disappeared at the end of the six-month intervention*." *Id.* (emphasis added). Thus, the Os article, which reported on the Heiss study, supports Plaintiff's position regarding the falsity of Defendant's marketing statements regarding the efficacy of PS as advertised.

14. A scientific article exists, Brendan J. Kelley, *et al.*, Alternative Medicine and Alzheimer's Disease, *Neurologist*, 14(5): 299-306 (Sept. 2008) (the "Kelley article"), a copy of which is attached hereto as **Exhibit "3"**, which reviewed eight alternative medicines touted as being beneficial for Alzheimer's disease. The Kelley article limited its analysis to eight of the best studied and/or most popularly used alternative medicines used for Alzheimer's disease. (Ex. 3 at pg. 10 of 13.) One of the eight substances examined in the Kelley article is PS. (Ex. 3 at pgs. 8-9 of 13.) In addressing PS, the Kelley article concluded, "Two trials of [bovine cortex-derived Phosphatidylserine] in [Alzheimer's disease] and one larger trial of [bovine cortex-derived Phosphatidylserine] in poorly defined dementia patients *failed to show convincing evidence of cognitive improvement… .*" (Ex. 3 at pg. 9 of 13) (emphasis added). In addressing all eight substances addressed in the Kelley article, it concluded, "The available evidence for the eight agents discussed in this review does not clearly

recommend any of them as being efficacious.  Nonetheless, they continue to be widely used….[T]here is clearly insufficient evidence to *recommend* any of these agents at this time…."  (Ex. 3 at pg. 10 of 13) (emphasis in original).

15. The Kelley article supports the proposition that PS has no measurable effect in improving the cognitive abilities of those who are suffering from cognitive impairment via Alzheimer's disease **or some other form of dementia**.  After all, the Kelley article reported on "one larger trial of [bovine cortex-derived Phosphatidylserine] in **poorly defined dementia patients**."  (Ex. 3 at pg. 9 of 13) (emphasis added).  The Kelley article elsewhere described that same study as "[a] multicenter randomized double-blind placebo-controlled study of 152 **loosely diagnosed** 'AD' patients examined the effect of [bovine cortex-derived Phosphatidylserine] 200 mg/day for 3 months, with proposed follow-up at 6, 12 18, and 24 months."  *Id.* (emphasis added).  In other words, the Kelley article characterized the subjects of such large randomized controlled trial[2] as "poorly defined dementia patients" because they were "loosely diagnosed 'AD' patients."  In other words, they were patients who were not clearly diagnosed as having Alzheimer's disease or even having "probable" Alzheimer's disease.

16. A scientific article exists, Seyed Khosrow Tayebati, *et al.*, Choline and *Choline alphoscerate* Do Not Modulate Inflammatory Processes in the Rat Brain, *Nutrients*, 9, 1084 (Sept. 29, 2017) (the "Tayebati study"), a copy of which is attached hereto as **Exhibit "4"**, which reported the results of a study of the effects of choline and a choline precursor, GPC, in the modulation of inflammatory processes in the rat brain.  The article stated that "the present study was designed to further investigate the effects of choline and GPC in the modulation of inflammatory processes in the rat brain . . . ." (Ex. 4 at pg. 2 of 13.)  The article's discussion and conclusion stated in relevant part: "[T]he present study evaluated the effects of choline and GPC treatments on

---

[2] "RCTs are generally considered the 'gold standard' of research studies…." *In re Avandia Marketing, Sales Practices and Products Liability Litig.*, 2011 WL 13576, at *12 (E.D. Pa. Jan 4, 2011).

inflammatory markers in normal brain conditions. The obtained results highlighted that in the basal conditions, choline and GPC did not modulate the expression of the pro-inflammatory cytokines and endothelial adhesion molecules that were tested. Hence, these treatments did not involve inflammatory activation pathways by these molecules at the level of neurons and intracerebral arteries. In addition, ***it appears that they do not have any anti-inflammatory effects on these conditions***." (Ex. 4 at pgs. 8-9 of 13) (emphasis added). Similarly, the abstract of the article stated, "The results clearly demonstrated that treatment with choline or GPC did not affect the expression of the inflammatory markers in the different cerebral areas evaluated. Therefore, choline and GlyceroPhosphoCholine ("GPC") did not stimulate the inflammatory processes that we assessed in this study." (Ex. 4 at pg. 1 of 13.) The mere fact that the Tayebati study constitutes an animal study does not necessarily make it unreliable. "Animal studies may be admissible to demonstrate general causation." *In re Silicone Gel Breast Implants Products Liability Litig.*, 318 F. Supp. 2d 879, 890 (C.D. Cal. Apr. 22, 2004) (Matz, J.).

17. A scientific article exists, Casey J. Thomas, *et al.*, The Effects of Energy Drink Consumption on Cognitive and Physical Performance in Elite League of Legends Players, *Sports*, 7, 196 (2019) (the "Reload study"), a copy of which is attached hereto as **Exhibit "5"**, which reported the results of a study of the cognitive and physical effects of consumption of an energy drink known as AI Reload on video gaming. Notably, the active ingredients in AI Reload included, *inter alia*, PS and "alpha-glycerylphosphorycholine" or alpha-GPC. (Ex. 5 at pg. 2 of 10.) The article stated that "we examined markers of ***cognitive function*** and mental and physiological fatigue in a convenience sample of elite eSport players ingesting an ergogenic supplement or placebo during a simulated competition." *Id.* (emphasis added). The article described its study as "a randomized, double-blind, placebo9-controlled cross-over trial." (Ex. 5 at pg. 1 of 10.) The article discussed the authors' hypothesis and the results of the study in relevant part as follows: "We hypothesized that the use of an energy drink would

improve markers of *cognitive* and physical performance.  We also hypothesized that mental fatigue accumulated through three consecutive video games would result in a decline in performance across a battery of *cognitive* and physical tests, and that the use of an energy drink would attenuate this decline.  Our data suggest that playing three consecutive LoL games does not result in an accumulation of mental fatigue ***and the consumption of an energy drink did not improve measured performance parameters***. Therefore, we rejected our research hypotheses." (Ex. 5 at pg. 7 of 10) (emphasis added).  The article concluded that "the administration of a supplement designed to improve performance demonstrated no ergogenic effects relative to the indices examined in this study."[3]  (Ex. 5 at pg. 8 of 10.)  The primary indices examined included "measures of attention," "reaction time," and "working memory." (Ex. 5 at pg. 1 of 10.)  The secondary outcome examined fatigue. *Id.*  The abstract stated, "Our findings suggest that elite eSport athletes do not demonstrate a mental or physical improvement in performance relative to the treatment supplement or indices measured in this study." *Id.*

18.  Plaintiff purchased the Product in substantial part based upon the above-referenced efficacy claims. Plaintiff used the Product as directed but did not experience any of the benefits promised by the Product.

19.  The "Who, What, When, Where, and How of the misconduct" is as follows:

    a.  **The "Who":** The party responsible for promulgating the false efficacy claims is Defendant Onnit Labs, Inc., of Austin, Texas.

    b.  **The "What":** The claims on the label of Defendant's product and accompanying marketing materials that the product promotes supports "memory, focus, and cognitive processing speed."

---

[3] A leading online dictionary defines "ergogenic" to mean "enhancing physical performance." https://www.merriam-webster.com/dictionary/ergogenic (last visited July 5, 2023).

   c.   **The "When":** The false claims were made throughout the class period, and Plaintiff purchased the product within the past six months;

   d.   **The "Where":** Plaintiff purchased the product at GNC in California.

   e.   **The "How":**   By making demonstrably false claims that its product provides memory benefits that it does not and cannot provide, Defendant has illegally collected millions of dollars from unsuspecting consumers.

## V.     CLASS ALLEGATIONS

20.   Plaintiff brings this action individually and on behalf of all others similarly situated (the "Class") defined as follows:

> **All persons within the United States who purchased the Product for personal use during the Class Period.**

A.   NUMEROSITY: Plaintiff does not know the number of Class Members but believes the number to be in the thousands, if not more. The exact identities of Class Members may be ascertained by the records maintained by Defendant and its authorized retailers.

B.   COMMONALITY: Common questions of fact and law exist as to all class members, and predominate over any questions affecting only individual members of the Class.  Such common legal and factual questions, which do not vary between Class members, and which may be determined without reference to the individual circumstances of any Class Member, include but are not limited to the following:

   i.   Whether Defendant violated the law;

   ii.   The amount of damages; and

   iii.   The proper injunctive relief.

C.   TYPICALITY: As a person who purchased the product for personal use and used it as directed, Plaintiff is asserting claims that are typical of the Class.

D.   ADEQUACY: Plaintiff will fairly and adequately protect the interests of the members of The Class. Plaintiff has retained attorneys experienced in the class action litigation.  All individuals with interests that are actually or potentially adverse to

or in conflict with the class or whose inclusion would otherwise be improper are excluded.

E.  SUPERIORITY: A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class Members is impracticable and inefficient. Even if every Class Member could afford individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed.

## VI.   CAUSES OF ACTION
### FIRST CAUSE OF ACTION
### Violations of the Consumer Legal Remedies Act, Cal. Civ. Code §§ 1750 et seq.

15. Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if set forth in full herein.

16. California's Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, et seq., prohibits deceptive practices in connection with the conduct of a business that provides goods, property, or services primarily for personal, family, or household purposes.

17. Defendant's false and misleading labeling and advertising was designed to, and did, induce the purchase and use of the Product for personal, family, or household purposes by Plaintiff and Class Members, and violated and continue to violate the following sections of the CLRA:

   i.  § 1770(a)(5): representing that goods have characteristics, uses, or benefits which they do not have; and

   ii. § 1770(a)(7): representing that goods are of a particular standard, quality, or grade if they are of another.

18. Defendant profited from the sale of the falsely, deceptively, and unlawfully advertised Product to unwary consumers. Defendant's wrongful business

practices constituted, and constitute, a continuing course of conduct in violation of the CLRA.

19. On December 14, 2022, Plaintiff, via her counsel, sent a letter to Defendant via Federal Express, which notified Defendant of the particular alleged violations of Section 1770, and demanded that Defendant correct, repair, replace, or otherwise rectify the goods or services alleged to be in violation of Section 1770. Such notice satisfied the CLRA notice requirements of Section 1782(a). More than 30 days elapsed without any response from Defendant agreeing to take any corrective action before Plaintiff commenced the instant action in the California Superior Court on March 29, 2023. Attached hereto as **Exhibit "6"** is a true and correct copy of a letter from Plaintiff's undersigned counsel to Defendant's principal place of business dated December 14, 2022.

## VII.  PRAYER FOR RELIEF

Wherefore, Plaintiff prays for judgment against Defendant for:

i. Appropriate class certification and management orders;
ii. Actual, statutory and punitive damages;
iii. An award of attorneys' fees and costs; and
iv. All other relief at law or in equity as may be proper.

Dated: July 5, 2023         PACIFIC TRIAL ATTORNEYS, APC

By: */s/ Scott J. Ferrell*
Scott. J. Ferrell
Attorneys for Plaintiff

**CERTIFICATE OF SERVICE**

I hereby certify that on July 5, 2023, I electronically filed the foregoing **FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE CONSUMER LEGAL REMEDIES ACT** with the Clerk of the Court using the CM/ECF system which will send notification of such filing via electronic mail to all counsel of record.

Dated: July 5, 2023

                               */s/ Scott J. Ferrell, Esquire*
                                   Scott J. Ferrell