1

**PACIFIC TRIAL ATTORNEYS**
A Professional Corporation
Scott J. Ferrell (Bar No. 202091)
sferrell@pacifictrialattorneys.com
Victoria C. Knowles, Bar No. 277231
vknowles@pacifictrialattorneys.com
4100 Newport Place Drive, Suite 800
Newport Beach, California 92660
Telephone: (949) 706-6464
Facsimile:  (949) 706-6469

Attorneys for Plaintiff
RUTH MARTIN

2

3

4

5

6

7

8

9

10

## UNITED STATE DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

11

12

13

14

15

16

17

| | |
|---|---|
| RUTH MARTIN, individually and on behalf of all others similarly situated,<br><br>   Plaintiff,<br><br>  v.<br><br>ONNIT LABS, INC., a Delaware corporation and DOES 1 through 10, inclusive,<br><br>   Defendants. | Case No. 2:23-cv-03737-FWS (KESx)<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S RESPONSE IN OPPOSITION TO MOTION TO DISMISS FIRST AMENDED COMPLAINT**<br><br>[Declaration of Scott J. Ferrell filed concurrently herewith; [Proposed] Order lodged concurrently herewith]<br><br>Date:   September 7, 2023<br>Time:   10:00 a.m.<br>Courtroom: 10D<br>Judge:  Hon. Fred W. Slaughter |

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................. 1

II.   ARGUMENT ...................................................................... 1

    A.   The Article Attached as Exhibit 1 to the FAC Supports Plaintiff's Position that GlyceroPhosphoCholine and Phosphatidyl Serine Supplementation Was Ineffective as a Nooptropic Supplement. ............................................. 1

    B.   The Article Attached as Exhibit 2 to the FAC Shows that PS Did Not Improve the Conditions of Subjects with Dementia. .................................. 3

    C.   The Article Attached as Exhibit 3 to the FAC Supports Plaintiff's Position that Phosphatidyl Serine Supplementation Was Ineffective as a Nooptropic Supplement ................................................................. 5

    D.   The Article Attached as Exhibit 4 to the FAC Supports Plaintiff's Position that GPC Supplementation Was Ineffective ................................................ 6

    E.   The Article Attached as Exhibit 5 to the FAC Supports Plaintiff's Position that Phosphatidyl Serine and GPC Supplementation Was Ineffective. ...... 8

    F.   Whether Or Not the Studies Cited by Plaintiff Support Plaintiff's Proposition Is a Factual Issue That Should Not Be Resolved Via the Instant Motion. ..................................................................... 10

    G.   The Instant Motion Is Premature to Determining Which Ingredients Are Key Ingredients. ........................................................... 11

    H.   Defendant's Reliance on Studies to Substantiate Its Claims Is Irrelevant to Deciding the Instant Motion.................................................. 12

    I.   The CLRA Demand for Money Damages Should Not Be Stricken. ........ 12

        1.   The CLRA Notice Was Made on Behalf of a Class of Consumers, Which Included Plaintiff................................................. 12

        2.   The CLRA Notice Identifies the "Particular Alleged Violations" of Section 1770.................................................................. 19

        3.   Plaintiff's Use of Fedex Substantially Complies. ........................... 20

    J.   The Prayer for Punitive Damages Should Not Be Stricken. ..................... 20

K.      Leave to Amend Should Be Granted..........................................................21

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

# **TABLE OF AUTHORITIES**

2

**Page(s)**

3

**Federal Cases**

4
5
*Aloudi v. Intramedic Research Group*,
   729 Fed. Appx. 514 (9th Cir. 2017)....................................................................12

6
7
*Barker v. Riverside County Office of Education*,
   584 F.3d 821 (9th Cir. 2009) ..............................................................................21

8
9
*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007)............................................................................................21

10
11
*Camreta v. Greene*,
   563 U.S. 692 (2011)............................................................................................11

12
*Colucci v. ZonePerfect Nutrition Co.*,
   2012 WL 6737800 (N.D. Cal. Dec. 28, 2012)....................................................19

13
14
*Cooper v. Pickett*,
   137 F.3d 616 (9th Cir. 1998) ..............................................................................11

15
16
*Freeman v. Indochino Apparel, Inc.*,
   443 F. Supp. 3d 1107 (N.D. Cal. 2020)..............................................................20

17
18
*Gallagher v. Bayer AG*,
   2015 WL 1056480 (N.D. Cal. Mar. 10, 2015) ....................................................10

19
20
*Hadley v. Kellogg Sales Co.*,
   273 F. Supp. 3d 1052 (N.D. Cal. 2017)..............................................................10

21
22
*In re 318 Patent Infringement Litig.*,
   578 F. Supp. 2d 711 (D. Del. Sept. 26, 2008)  ...............................................4, 5

23
*In re Avandia Marketing, Sales Practices and Products Liability Litig.*,
   2011 WL 13576 (E.D. Pa. Jan 4, 2011)...............................................................6

24
25
*In re Silicone Gel Breast Implants Products Liability Litig.*,
   318 F. Supp. 2d 879 (C.D. Cal. Apr. 22, 2004) (Matz, J.) ..................................6

26
27
*Johnson-Jack v. Health-Ade LLC*,
   587 F. Supp. 3d 957 (N.D. Cal. 2022)................................................................10

28

*Jones v. Porsche Cars North America, Inc.*,
   2015 WL 11995257 (C.D. Cal. Oct. 15, 2015)....................................................20

*Krommenhock v. Post Foods, LLC*,
   255 F. Supp. 3d 938 (N.D. Cal. 2013) ...............................................................10

*Pedroza v. BRB*,
   624 F.3d 926 (9th Cir. 2010) .............................................................................12

*Quinn v. Walgreen Co.*,
   958 F. Supp. 2d 533 (S.D.N.Y. 2013) ................................................................10

*Schlagel v. Learning Tree Int'l*,
   1998 WL 1144581 (C.D. Cal. Dec. 23, 1998)....................................................11

*Shein v. Canon U.S.A., Inc.*,
   2009 WL 3109721 (C.D. Cal. Sept. 22, 2009) ...................................................20

*Stearns v. Ticketmaster Corp.*,
   655 F.3d 1013 (9th Cir. 2011), *abrogated on other grounds by Comcast
   Corp. v. Behrend*, 569 U.S. 27 (2013) ...............................................................19

*Victor v. R.C. Bigelow, Inc.*,
   2014 WL 1028881 (N.D. Cal. Mar. 14, 2014) ..............................................17, 18

*Vizcarra v. Unilever U.S., Inc.*,
   2020 WL 4016810 (N.D. Cal. July 16, 2020) .......................................... *passim*

**California Cases**

*Fidelity Sound System, Inc. v. American Bonding Co.*,
   85 Cal. App. 3d Supp. 13 (1978) .......................................................................20

*Gonzalez v. Onnit Labs, Inc.*,
   No. 23STCV05741 (Cal. Super. Ct. L.A. Cty. filed Mar. 15, 2023)............13, 14

*Kagan v. Gibraltar Sav. & Loan Assn.*,
   35 Cal. 3d 582 (1984) ..................................................................................14, 15

*Lafferty v. Wells Fargo Bank*,
   213 Cal. App. 4th 545 (2013) ............................................................................19

*Meyer v. Sprint Spectrum L.P.*,
   45 Cal. 4th 634 (2009) .......................................................................................14

*Outboard Marine Corp. v. Superior Court*,
  52 Cal. App. 3d 30 (1975) ................................................................18

**Federal Regulations**

21 C.F.R.
  § 101.4(a)(1)........................................................................................8
  § 101.93(c)(2)......................................................................................4

**California Statutes**

Civil Code
  § 1750 *et seq.* ....................................................................................12
  § 1760.........................................................................................17, 19
  § 1770.........................................................................................14, 15
  § 1770(a) ............................................................................................19
  § 1770(a)(5).......................................................................................19
  § 1781(a) ............................................................................................15
  § 1782................................................................................................18
  § 1782(a) ..................................................................................... *passim*
  § 1782(c) ....................................................................................15, 17
  § 1783................................................................................................13
  § 3294(a) ...........................................................................................21
  Consumers Legal Remedies Act ............................................... *passim*

**Federal Rules**

Rule 9(b).................................................................................................11

Rule 12(b)(6) ...............................................................................10, 21

**Other Authorities**

Barringer, Nicholas, *et al.*, Impact of a purported nootropic
  supplementation on measures of mood, stress, and marksmanship
  performance in U.S. active duty soldiers, *Journal of the International
  Society of Sports Nutrition* (2018) ............................................. *passim*

Heiss, W.-D., *et al.*, "Long-term effects of phosphatidylserine, pyritinol,
  and cognitive training in Alzheimer's disease. A neuropsychological,
  EEG, and PET investigation," *Dementia*, vol. 5, no. 2, pp. 88-98, 1994 ... *passim*

https://www.mayoclinic.org/diseases-conditions/encephalitis/symptoms-
  causes/syc-20356136 (last visited Aug. 10, 2023) ...............................8

https://www.merriam-webster.com/dictionary/ergogenic (last visited Aug. 9, 2023) ................................................................................................................9

https://www.merriam-webster.com/dictionary/nootropic (last visited Aug. 9, 2023) ................................................................................................................1

https://www.serveindex.com/serving-legal-documents-via-certified-mail-fedex-or-ups/#:~:text=Certified%20mail%20service%20is%20generally,paper%20needs%20to%20be%20served (last visited Aug. 11, 2023) ..........................20

Kelley, Brendan J., *et al.*, Alternative Medicine and Alzheimer's Disease, *Neurologist*, 14(5): 299-306 (Sept. 2008)............................................ 5, 6, 10, 11

Tayebati, Seyed Khosrow, *et al.*, Choline and *Choline alphoscerate* Do Not Modulate Inflammatory Processes in the Rat Brain, *Nutrients*, 9, 1084 (Sept. 29, 2017)................................................................................. *passim*

Thomas, Casey J., *et al.*, The Effects of Energy Drink Consumption on Cognitive and Physical Performance in Elite League of Legends Players, *Sports*, 7, 196 (2019)............................................................. 8, 9, 10, 11

van Os, Yindee, *et al.*, Cognitive Interventions in Older Persons: Do They Change the Functioning of the Brain?, *BioMed Research International* (2015) ................................................................................................. *passim*

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.   INTRODUCTION**

Defendant Onnit Labs, Inc. ("Defendant") claims that its product known as Alpha Brain (the "Product") supports "memory, focus, and cognitive processing speed." (First Amended Complaint ("FAC") ¶ 9.)   This claim has been proven scientifically false; indeed, the FAC "brings receipts" by attaching a non-exclusive list of citations to published scientific articles demonstrating the proven falsity of the efficacy claims.

In its Motion to Dismiss, Defendant quibbles with the credibility of the referenced studies, which might be appropriate at summary judgment, but is premature at the pleading stage.  Suffice it to say that several of the studies are randomized controlled trials, which are treated as the "gold standard" of research studies.

Because Plaintiff has demonstrated robust (not merely plausible) facts showing that Defendant's advertising claims are false, the Court should deny the instant Motion.

**II.   ARGUMENT**

**A.   The Article Attached as Exhibit 1 to the FAC Supports Plaintiff's Position that GlyceroPhosphoCholine and Phosphatidyl Serine Supplementation Was Ineffective as a Nooptropic Supplement.**

Exhibit 1 to the FAC consists of a scientific article, Nicholas Barringer, *et al.*, Impact of a purported nootropic supplementation on measures of mood, stress, and marksmanship performance in U.S. active duty soldiers, *Journal of the International Society of Sports Nutrition* (2018) (the "Alpha Brain study"), which found no statistically significant difference between subjects who consumed a nootropic[1] supplement product known as Alpha Brain for 30 days versus a placebo for a variety of criteria including "hits," "initial reaction time in seconds," mean reaction time in seconds," "or distance from center mass in centimeters." (Doc. 17-1; Page ID #185.)  The Alpha Brain study

---

[1] A leading online dictionary defines "nootropic" to mean "a substance that enhances cognition and memory and facilitates learning." https://www.merriam-webster.com/dictionary/nootropic (last visited Aug. 9, 2023).  A nootropic is a dietary supplement that helps support certain brain functions, including memory, mental speed, and focus.

stated, "In this study, we found that 30 days of Alpha Brain nootropic supplement consumption did not have any statistically significant effects on measures of marksmanship performance …." (Doc. 17-1; Page ID #186.)  The Alpha Brain study stated, "Despite following a dosing pattern (3 times daily) and daily amount (1972.5 g) consistent with investigations suggesting potential ergogenic benefit [1, 18] we did not see improvement in the number of target hits, distance from center of mass, or reaction time during a prone supported marksmanship task … in rested, otherwise healthy Soldiers." (Doc. 17-1; Page ID #186.)  The Alpha Brain study concluded, "30 days of dosing with the Alpha Brain supplement at 3 pills per day or 1972.5 mg per day dosing had no appreciable effect on marksmanship … in otherwise well rested Soldiers engaged in a basic marksmanship test." (Doc. 17-1; Page ID #187.)

Notably, the supplement product that was studied in the Alpha Brain study is the same product at issue in the instant action, *i.e.*, the Product.  (FAC ¶ 8; *id.* at 2:2-4.)  The Alpha Brain study states that a "key ingredient in Alpha Brain" is PhosphatidySerine ("PS").  (Doc. 17-1; Page ID #184.)  In addition, the Alpha Brain study states that "another component of Alpha Brain" is L-alpha-glycerphosporycholine (Alpha GPC)."  *Id.*  Thus, the Alpha Brain study researched the same two ingredients that are contained in the Product.

Although Defendant contends that marksmanship is irrelevant to evaluating the Product's efficacy, (Def.'s Mem. at 2:25-26), Defendant ignores that the Alpha Brain study stated, "The main purpose of this study was to determine if a commercially available nootropic would improve marksmanship performance, ***specifically accuracy and target acquisition time***."  (Doc. 17-1; Page ID #184) (emphasis added).  Needless to say, "accuracy" in marksmanship performance is relevant here as is "target acquisition time."  As alleged in the FAC and freely acknowledged by Defendant, Defendant's website contains a marketing statement claiming that its Product supports memory, ***focus***, ***and cognitive processing speed***."  (FAC ¶ 9) (emphasis added); (Def.'s Mem. at 2:9-10.)  Needless to say, the Alpha Brain study's evaluation of "accuracy and target acquisition

time" are directly relevant to disproving Defendant's marketing claims that its Product supports "focus" and "cognitive processing speed."  Any attempt to argue to the contrary would be disingenuous.

Notably, the Alpha Brain study was funded "by a grant from Onnit LLC," (Doc. 17-1; Page ID #187.)  In disclosing the author's competing interests, the lead author freely disclosed that Onnit LLC is "the maker of the product tested."  *Id.*  In other words, the maker of the Product provided a grant to have its own product tested for its alleged nootropic properties presumably with the expectation of using the results of the Alpha Brain study to bolster its marketing of the Product, but the (unexpected) results of such testing did not support the hypothesis that it would have such properties making the Alpha Brain study useless to bolster Onnit LLC's marketing of the Product.

## B.    The Article Attached as Exhibit 2 to the FAC Shows that PS Did Not Improve the Conditions of Subjects with Dementia.

Exhibit 2 to the FAC consists of a published review article addressing a study conducted on patients with dementia with PS intervention.  In Yindee van Os, *et al.*, Cognitive Interventions in Older Persons: Do They Change the Functioning of the Brain?, *BioMed Research International* (2015) (the "Os article"), the Os article conducted a systematic literature search of articles published from 1993 to March 2012, which met the following criteria:  "(i) the study had to involve the healthy elderly, the healthy elderly with cognitive complaints, and the elderly with Mild Cognitive Impairment or elderly with dementia; (ii) the study had to contain a cognitive intervention; (iii) the study had comparisons of brain activity measurements before and after the intervention; (iv) the study had a full report available; (v) the articles were in English."  (Doc. 17-2; Page ID #191.)  "A total of 19 studies met all inclusion criteria."  *Id.*  Amongst the 19 studies that met such criteria was a certain study of dementia patients with PS intervention, W.-D. Heiss, *et al.*, "Long-term effects of phosphatidylserine, pyritinol, and cognitive training in Alzheimer's disease. A neuropsychological, EEG, and PET investigation," *Dementia*, vol. 5, no. 2, pp. 88–98, 1994 (the "Heiss study").  (Doc. 17-2; Page ID #193, #197, #199-

#200, #203.)  The Heiss study was a randomized, controlled trial involving four different groups of 80 total participants with Alzheimer's disease with different interventions for six months.  (Doc. 17-2; Page ID #199.)  "The content of their intervention was different. The 17 participants received social support (group 1), 18 participants received cognitive training twice a week (group 2), 18 participants received a combination of the cognitive training and the drug pyritinol that is used for symptomatic treatment of [Alzheimer's disease] (group 3), and finally 18 participants received cognitive training and ***the dietary supplement phosphatidylserine***."  *Id.* (emphasis added).

According to the Os article, "In weeks 8 and 16, the group that received cognitive training and phosphatidylserine scored significantly better on orientation than the other intervention groups.  ***This effect was no longer present at the end of the intervention***." (Doc. 17-2; Page ID #200) (emphasis added).  The Os article elsewhere described the Heiss study as follows:  "According to one study [25], ***the changes in neuropsychological measurements and brain activity were temporary and disappeared at the end of the six-month intervention***."  *Id.* (emphasis added).  Thus, the Os article, which reported on the Heiss study, supports Plaintiff's position regarding the falsity of Defendant's marketing statements regarding the efficacy of PS as advertised.

Although Defendant contends that Defendant has never claimed that its Product treats Alzheimer's disease, (Def.'s Mem. at 3:7-8), that is not surprising given that Defendant markets its Product as a "Dietary Supplement" as opposed to a "drug" intended to treat a disease like Alzheimer's disease.[2]  (*See* FAC ¶ 8; Def.'s Mem. at 3 n.1.)  A drug is subject to a far more onerous set of legal standards and FDA regulation.  What matters is that individuals who suffer from Alzheimer's disease can have a variety of cognitive issues affecting their memory, attention, and learning.  *In re 318 Patent Infringement Litig.*, 578 F. Supp. 2d 711, 716 (D. Del. Sept. 26, 2008) ("In 1984, AD was recognized

---

[2] Nutritional supplements are required to set forth on their labeling statements the ubiquitous DSHEA disclaimer stating, "These statements have not been evaluated by the Food and Drug Administration.  This product is not intended to diagnose, treat, cure or prevent any disease."  21 C.F.R. § 101.93(c)(2).

as a progressive dementia that begins with an onset of memory problems. As AD progresses, initial memory problems develop into more serious memory problems and begin to affect other higher brain functions, such as judgment, reasoning, language ability, perception, and recognition. The behavioral and functional abilities of AD patients are also affected."). As such, the Heiss study, which is addressed in the Os article, is relevant in supporting the efficacy of PS regarding the falsity of the Product's labeling and other marketing claims.

### C. The Article Attached as Exhibit 3 to the FAC Supports Plaintiff's Position that Phosphatidyl Serine Supplementation Was Ineffective as a Nooptropic Supplement.

Exhibit 3 to the FAC consists of a scientific article, Brendan J. Kelley, *et al.*, Alternative Medicine and Alzheimer's Disease, *Neurologist*, 14(5): 299-306 (Sept. 2008) (the "Kelley article"), which reviewed eight alternative medicines touted as being beneficial for Alzheimer's disease. The Kelley article limited its analysis to eight of the best studied and/or most popularly used alternative medicines used for Alzheimer's disease. (Doc. 17-3; Page ID #214.) One of the eight substances examined in the Kelley article is PS. (Doc. 17-3; Page ID #212-#213.) In addressing PS, the Kelley article concluded, "Two trials of [bovine cortex-derived Phosphatidylserine] in [Alzheimer's disease] and one larger trial of [bovine cortex-derived Phosphatidylserine] in poorly defined dementia patients ***failed to show convincing evidence of cognitive improvement… .***" (Doc. 17-3; Page ID #213) (emphasis added). In addressing all eight substances addressed in the Kelley article, it concluded, "The available evidence for the eight agents discussed in this review does not clearly recommend any of them as being efficacious. Nonetheless, they continue to be widely used….[T]here is clearly insufficient evidence to *recommend* any of these agents at this time…." (Doc. 17-3; Page ID #214) (emphasis in original).

Although Defendant criticizes the Kelley article by arguing that the Product "does not claim to treat Alzheimer's," (Def.'s Mem. at 3:15), the Kelley article supports the

proposition that PS has no measurable effect in improving the cognitive abilities of those who are suffering from cognitive impairment via Alzheimer's disease *or some other form of dementia*.  After all, the Kelley article reported on "one larger trial of [bovine cortex-derived Phosphatidylserine] in *poorly defined dementia patients*."  (Doc. 17-3; Page ID #213) (emphasis added).  The Kelley article elsewhere described that same study as "[a] multicenter randomized double-blind placebo-controlled study of 152 *loosely diagnosed* 'AD' patients examined the effect of [bovine cortex-derived Phosphatidylserine] 200 mg/day for 3 months, with proposed follow-up at 6, 12 18, and 24 months." *Id.* (emphasis added).  In other words, the Kelley article characterized the subjects of such large randomized controlled trial[3] as "poorly defined dementia patients" because they were "loosely diagnosed 'AD' patients."  In other words, they were patients who were not clearly diagnosed as having Alzheimer's disease or even having "probable" Alzheimer's disease.  Thus, Defendant's characterization of the results of the large study reported in the Kelley article as involving "people with Alzheimer's disease," (Def.'s Mem. at 3:11), is factually inaccurate and highly misleading.

**D.    The Article Attached as Exhibit 4 to the FAC Supports Plaintiff's Position that GPC Supplementation Was Ineffective.**

Exhibit 4 to the FAC consists of a scientific article, Seyed Khosrow Tayebati, *et al.*, Choline and *Choline alphoscerate* Do Not Modulate Inflammatory Processes in the Rat Brain, *Nutrients*, 9, 1084 (Sept. 29, 2017) (the "Tayebati study"), which reported the results of a study of the effects of choline and a choline precursor, GPC, in the modulation of inflammatory processes in the rat brain.[4]  The article stated that "the present study was designed to further investigate the effects of choline and GPC in the modulation of

---

[3] "RCTs are generally considered the 'gold standard' of research studies...."  *In re Avandia Marketing, Sales Practices and Products Liability Litig.*, 2011 WL 13576, at *12 (E.D. Pa. Jan 4, 2011).

[4] The mere fact that the Tayebati study constitutes an animal study does not necessarily make it unreliable.  "Animal studies may be admissible to demonstrate general causation."  *In re Silicone Gel Breast Implants Products Liability Litig.*, 318 F. Supp. 2d 879, 890 (C.D. Cal. Apr. 22, 2004) (Matz, J.).

inflammatory processes in the rat brain . . . ."  (Doc. 17-4; Page ID #220.)  The article's discussion and conclusion stated in relevant part:

> "[T]he present study evaluated the effects of choline and GPC treatments on inflammatory markers in normal brain conditions.  The obtained results highlighted that in the basal conditions, choline and GPC did not modulate the expression of the pro-inflammatory cytokines and endothelial adhesion molecules that were tested.  Hence, these treatments did not involve inflammatory activation pathways by these molecules at the level of neurons and intracerebral arteries.  In addition, ***it appears that they do not have any anti-inflammatory effects on these conditions***."

(Doc. 17-4; Page ID #225-#226) (emphasis added).  Similarly, the abstract of the article stated, "The results clearly demonstrated that treatment with choline or GPC did not affect the expression of the inflammatory markers in the different cerebral areas evaluated.  Therefore, choline and GlyceroPhosphoCholine ("GPC") did not stimulate the inflammatory processes that we assessed in this study."  (Doc. 17-4; Page ID #219.)

Although Defendant contends that its Product "does not claim to modulate inflammatory processes in either rat or human brains," (Def.'s Mem. at 4:1-2), the causal link between inflammation in the brain and brain tissue injury resulting in symptoms such as memory loss is well-known.  (Doc. 17-4; Page ID #220) ("A beneficial cholinergic anti-inflammatory effect on endothelial function was shown through the activation of anti-inflammatory neuro-immunological mechanisms which modulate the innate immune response by ***limiting the pro-inflammatory process***, thereby minimizing ***tissue injury***[.]") (emphasis added); (Doc. 17-4; Page ID #219) (stating that choline "is the precursor and metabolite of acetylcholine (ACh)," "cholinergic precursors are involved in ACh release and carry out a neuroprotective effect based on an anti-inflammatory action," and that GPC is a "choline precursor"); (Doc. 17-4; Page ID #226) (stating that "Choline and choline precursors" including GPC "represent molecules that can potentially increase ACh release and improve the integrity of cell membranes," but "the decrease of ACh and the breakdown of cell membranes resulting from several pathological processes

1   may evolve in nerve cell injury and neurological disorders");

2   https://www.mayoclinic.org/diseases-conditions/encephalitis/symptoms-causes/syc-

3   20356136 (last visited Aug. 10, 2023) ("Encephalitis … is inflammation of the brain….

4   And when it's caused by your own immune system attacking the brain, it's known as

5   autoimmune encephalitis. Sometimes there is no known cause.  In some cases,

6   encephalitis can be life-threatening…. In cases of autoimmune encephalitis,…it's

7   common for people to have a combination of symptoms including: … Memory loss[.]").

8   Thus, the Tayebati study clearly states that the purpose of why it studied GPC is to

9   determine whether or not it can improve "the integrity of cell membranes" by "carry[ing]

10   out a neuroprotective effect based on part of an anti-inflammatory action" to decrease the

11   breakdown of cell membranes causing nerve cell injury.  Indeed, if GPC has no anti-

12   inflammatory effect on the human brain, then why is that active ingredient identified in

13   the required information panel as one of the predominant ingredients in the Product

14   pursuant to 21 C.F.R. § 101.4(a)(1)?

15        **E.**     **The Article Attached as Exhibit 5 to the FAC Supports Plaintiff's**

16                **Position that Phosphatidyl Serine and GPC Supplementation Was**

17                **Ineffective.**

18         Exhibit 5 to the FAC consists of a scientific article, Casey J. Thomas, *et al.*, The

19   Effects of Energy Drink Consumption on Cognitive and Physical Performance in Elite

20   League of Legends Players, *Sports*, 7, 196 (2019) (the "Reload study"), which reported

21   the results of a study of the cognitive and physical effects of consumption of an energy

22   drink known as AI Reload on video gaming.  Notably, the active ingredients in AI Reload

23   included, *inter alia*, PS and "alpha-glycerylphosphorycholine" or alpha-GPC.  (Doc. 17-

24   5; Page ID #234.)  The article stated that "we examined markers of ***cognitive function***

25   and mental and physiological fatigue in a convenience sample of elite eSport players

26   ingesting an ergogenic supplement or placebo during a simulated competition."  *Id.*

27   (emphasis added).  The article described its study as "a randomized, double-blind,

28

placebo-controlled cross-over trial." (Doc. 17-5; Page ID #233.) The article discussed the authors' hypothesis and the results of the study in relevant part as follows:

> "We hypothesized that the use of an energy drink would improve markers of ***cognitive*** and physical performance. We also hypothesized that mental fatigue accumulated through three consecutive video games would result in a decline in performance across a battery of ***cognitive*** and physical tests, and that the use of an energy drink would attenuate this decline. Our data suggest that playing three consecutive LoL games does not result in an accumulation of mental fatigue ***and the consumption of an energy drink did not improve measured performance parameters***. Therefore, we rejected our research hypotheses."

(Doc. 17-5; Page ID #239) (emphasis added). The article concluded that "the administration of a supplement designed to improve performance demonstrated no ergogenic effects relative to the indices examined in this study."[5] (Doc. 17-5; Page ID #240.) The primary indices examined included "measures of attention," "reaction time," and "working memory." (Doc. 17-5; Page ID #233.) The secondary outcome examined fatigue. *Id.* The abstract stated, "Our findings suggest that elite eSport athletes do not demonstrate a mental or physical improvement in performance relative to the treatment supplement or indices measured in this study." *Id.*

Although Defendant contends that the Product "is not an energy drink and does not claim to improve video game performance," (Def.'s Mem. at 4:10-11), Defendant's arguments ignore that no improvement of cognitive function was found to exist after subjects consumed a drink containing PS and GPC. That is the significance of the Reload study, which Defendant avoids addressing. Ironically, Defendant argues that Exhibit 1 to the FAC, which addresses the Alpha Brain study, also addresses two other studies showing a benefit in "cognitive function" that support the Product's marketing claims. (Def.'s Mem. at 6:20-23.) Simply put, Defendant can't have it both ways. If "cognitive function"

---

[5] A leading online dictionary defines "ergogenic" to mean "enhancing physical performance." https://www.merriam-webster.com/dictionary/ergogenic (last visited Aug. 9, 2023).

is, in fact, relevant to and supportive of the Product's marketing claims, then the Reload study's findings are equally relevant.

### F.    Whether Or Not the Studies Cited by Plaintiff Support Plaintiff's Proposition Is a Factual Issue That Should Not Be Resolved Via the Instant Motion.

Whether or not the Alpha Brain study, the Kelley article, the Tayebati study, the Reload study, and the Os article/Heiss study support Plaintiff's proposition is an issue of fact that the Court should not resolve via the instant Rule 12(b)(6) motion. *Quinn v. Walgreen Co.*, 958 F. Supp. 2d 533, 544 (S.D.N.Y. 2013) ("Whether or not the studies support plaintiff's proposition ... is an issue of fact the Court cannot resolve on a motion to dismiss.").

"At this juncture, relevant studies supporting plaintiffs' theory (at least in part) have been alleged, and determining the full extent of that support is not appropriate on a motion to dismiss." *Krommenhock v. Post Foods, LLC*, 255 F. Supp. 3d 938, 963 (N.D. Cal. 2013) (citing *Gallagher v. Bayer AG*, 2015 WL 1056480, at *9 (N.D. Cal. Mar. 10, 2015) ("The portions of the studies Bayer cites address specific vitamin deficiencies (B6, B12, folic acid) and do not necessarily prove the benefit or admit to inconclusive evidence of the benefit from taking supplements with those vitamins for "supported" or "increased" physical energy. They instead discuss the potential benefit from taking specific vitamins for individuals who are anemic or suffer from a nutritional deficit. ***Whether the fact that certain vitamins may support certain nutrient-deficient individuals is legally the same as Bayer's broad claim of "supporting physical energy" for all consumers is a matter that cannot be determined on a motion to dismiss on this limited record***.") (emphasis added)); *Johnson-Jack v. Health-Ade LLC*, 587 F. Supp. 3d 957, 970 (N.D. Cal. 2022) (citing *Krommenhock*); *Hadley v. Kellogg Sales Co.*, 273 F. Supp. 3d 1052, 1067 (N.D. Cal. 2017) (citing *Krommenhock*).  As was the case in *Gallagher v. Bayer AG*, it is premature to decide on a motion to dismiss the extent to which the Alpha Brain study, the

Kelley article, the Tayebati study, the Reload study, or the Os article/Heiss study support Plaintiff's position.

"[Overly rigorous standards risk premature dismissal of possibly meritorious cases. The Court must strike a careful balance between insistence on compliance with demanding pleading standards and ensuring that valid grievances survive.  As the Ninth Circuit concluded, ' '[w]e cannot make Rule 9(b) carry more weight than it was meant to bear.' ' " *Schlagel v. Learning Tree Int'l*, 1998 WL 1144581, at *8 (C.D. Cal. Dec. 23, 1998) (citing *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1998) (citation omitted)).

**G.     The Instant Motion Is Premature to Determining Which Ingredients Are Key Ingredients.**

Although Defendant contends that the Product contains "12 active ingredients," (Def.'s Mem. at 8:1-2), and cites a single unpublished federal district court decision for the proposition that false advertising claims should be supported by studies of the key ingredients in the challenged product,[6] (Def.'s Mem. at 8:4-6), Defendant curiously makes no attempt at all to identify which of those "12 active ingredients" are "key ingredients." (Def.'s Mem. at 8:5.)  Indeed, Defendant appears to be including in its purported list of "12 active ingredients" certain ingredients identified in the required information panel, *i.e.*, Maltodextrin, Vegetable capsule (Hydroxypropyl Methycellulose), Rice Hull Concentrate, even though Defendant is surely not arguing that such ingredients have any efficacy in supporting "memory, focus, and cognitive processing speed."  (FAC ¶¶ 8-9.) Indeed, if a supplement maker can evade any liability for false advertising of dietary supplements by simply including on its packaging label various ingredients that have no proven efficacy for a product's labeling/marketing claims without any negative consequences, then supplement makers will be incentivized to include extra ingredients in their products exclusively for purposes of creating a liability shield.

---

[6] "A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case." *Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011).

Finally, Defendant's reliance upon *Aloudi v. Intramedic Research Group*, 729 Fed. Appx. 514, 516 (9th Cir. 2017), is misplaced.   First, *Aloudi* is an unpublished memorandum disposition, which has no precedential effect.  *Pedroza v. BRB*, 624 F.3d 926, 931 (9th Cir. 2010) ("unpublished decision is not precedent for" Ninth Circuit).

Second, as Defendant itself has pointed out via its parenthetical describing the holding in *Aloudi*, the Ninth Circuit affirmed the dismissal of that case in part because none of the allegations involved scientific testing of the actual product at issue therein. Defendant inexplicably ignores that the Alpha Brain study is cited in the FAC.  (FAC ¶ 11 & Ex. 1.)  Thus, *Aloudi* is easily distinguishable.

**H.**     **Defendant's Reliance on Studies to Substantiate Its Claims Is Irrelevant to Deciding the Instant Motion.**

Although Defendant relies upon various studies, including some of the same studies cited by Plaintiff in the FAC, to substantiate its labeling claims, (Def.'s Mem. at 6:14-23; 8:11-19; 8:22), Defendant's reliance such studies is misplaced in the specific context of deciding the instant Motion.  The proper inquiry is whether Plaintiff (not Defendant) has cited scientific studies making it factually plausible that Defendant's labeling statements are false or misleading.  Plaintiff submits that she has done so.  The instant Motion is neither the time nor place for the Court to evaluate in a fact-finding capacity as to which party's scientific studies are more reliable or the weight to the attributed to the studies cited by Plaintiff.

**I.**     **The CLRA Demand for Money Damages Should Not Be Stricken.**

Defendant's arguments that the Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750 *et seq.*, demand letter attached as Exhibit 6 to the FAC is defective are without merit.

**1.**     **The CLRA Notice Was Made on Behalf of a Class of Consumers, Which Included Plaintiff.**

Defendant's argument that the CLRA notice attached as Exhibit 6 to the FAC is defective because it did not identify the name of a specific consumer is wrong.

Although it is true that the CLRA notice attached as Exhibit 6 to the FAC refers to "[o]ur client" in the singular tense, that was a typographical error that Defendant should have recognized because the CLRA notice expressly requested a "refund" to "all California purchasers the amount paid for the Product in the past four years." (FAC Ex. 6; Doc. 17-6; Page ID #244) ("We respectfully request that you … refund all California purchasers the amount paid for the Product in the past four years."). In other words, the CLRA notice clearly put Defendant on notice that it was made **on behalf of a class of consumers, which included Plaintiff**. Similarly, Defendant either knew or should have known that it could not settle **a single individual's refund claims** upon receipt of such CLRA notice and expect to avoid a putative class action from being filed against it.

Indeed, Defendant conveniently ignores that the complaint filed in *Gonzalez v. Onnit Labs, Inc.*, No. 23STCV05741 (Cal. Super. Ct. L.A. Cty. filed Mar. 15, 2023), was filed as a **putative class action**. (RJN Ex. B; Doc. 21-4; Page ID #279, #282-#284.) In other words, the CLRA demand letter implicitly referenced in paragraph 19 of that complaint was intended to encompass the money damages claims of **all putative class members including Plaintiff in the instant action**. (Doc. 21-4; Page ID #284.) The class was defined in that complaint as:

> "**All persons within the United States who purchased the Product for personal use during the Class Period**."

(RJN Ex. B; Doc. 21-4; Page ID #282 (emphasis in original); *Gonzalez* Compl. ¶ 14.) Given that the CLRA has a three-year statute of limitations, Cal. Civ. Code § 1783, the *Gonzalez* complaint sought to certify a class period dating back to March 15, 2020.

The original Complaint in the instant action alleged that "Plaintiff purchased the product within the past six months[.]" (Compl. ¶ 13; Doc. 1-5; Page ID #28.) Given that the original Complaint was filed on March 29, 2023, this necessarily meant that Plaintiff was referring to the time period between September 29, 2022-March 29, 2023.[7] Thus,

---

[7] Plaintiff purchased the Product in 2022.

Plaintiff's claim was surely included within the class period defined in the *Gonzalez* complaint.

"A demand letter under section 1782(a) can be made on behalf of an individual consumer *or on behalf of a class of consumers*." *Vizcarra v. Unilever U.S., Inc.*, 2020 WL 4016810, at *2 (N.D. Cal. July 16, 2020) (emphasis added) (citing *Kagan v. Gibraltar Sav. & Loan Assn.*, 35 Cal. 3d 582, 590 (1984) (holding that demand letter under section 1782(a) can set forth "an individual or class grievance" with respect to alleged violations of section 1770), *disapproved of on other grounds by Meyer v. Sprint Spectrum L.P.*, 45 Cal. 4th 634 (2009)).  In *Kagan*, the California Supreme Court explained:

> "We agree that a consumer who has notified a prospective defendant of an *individual grievance* and has obtained his or her requested relief cannot subsequently bring either an individual or class action under the Act.  However, this is not simply because the consumer no longer "suffers any damage" but because the prospective defendant has remedied the contested practices. Similarly, *a prospective defendant receiving notice of a grievance which affects a class of consumers can avert a subsequent class action only by remedying the contested practices as to all affected consumers.*  The critical inquiry for determining whether a prospective defendant may be subject to an individual *or class action* is therefore *whether the prospective defendant has made all remedies appropriate to the notice which it has received*."

*Kagan*, 35 Cal. 3d at 591 (emphasis added).  The High Court then analyzed the demand letter at issue therein as follows:

> "These demands put [Defendant] on notice that its alleged violations of section 1770 affected individuals in addition to plaintiff and her husband, and possibly a broad class of consumers."

*Id.* at 592.  *Kagan* then held:

> "As these [demand] letters, taken together, put [Defendant] on notice that its alleged violations of section 1770 affected a class of consumers, [Defendant] was under an

> affirmative obligation to meet the conditions set forth in section 1782, subdivision (c) in order to avert a class action.  There is no evidence to indicate that [Defendant] made an effort to meet any of these conditions.  [Defendant] did not seek to identify consumers similarly situated to plaintiff, or notify such consumers that it would provide them relief upon their request.  Nor did [Defendant] demonstrate that it had provided requested relief to any similarly situated consumers or that it would cease from engaging in the challenged conduct within a reasonable time."

*Id. Kagan* added:

> "As [Defendant] did not meet the conditions of section 1782, subdivision (c) in response to notification of its alleged class violations of section 1770, a class action for damages pursuant to section 1781, subdivision (a) may lie."

*Id. Kagan* noted:

> "Note that section 1782(c) precludes the further maintenance of the action only if *all* the described conditions are shown to exist.  Those conditions require settlement with all reasonably identifiable members of the class."

*Id.* at 593 (emphasis in original).  *Kagan* continues to set forth California law as to the foregoing propositions of law especially regarding the CLRA notice provision in subdivision (a) of section 1782 and the defendant's obligations to satisfy all of the class settlement provisions in subdivision (c) when a defendant receives notice of a grievance that affects a class of consumers.  *Vizcarra*, 2020 WL 4016810, at *3 ("The resolution of claims for damages asserted on behalf of a class of consumers, however, requires more than simply correcting the alleged CLRA violation with respect to an individual consumer who seeks to be a class representative. In that circumstance, the person served with the demand letter cannot negate the class claims for damages unless the person offers to provide appropriate corrections to *all* members of the class of consumers.") (emphasis in original).

  The decision in *Vizcarra* is directly on point.  The defendant therein made a strikingly similar argument seeking to dismiss the plaintiff's claim for damages under the

CLRA because the plaintiff failed to send the defendant a pre-lawsuit demand letter under section 1782(a). *Vizcarra*, 2020 WL 4016810, at *2. Although the defendant therein did not receive a demand letter from the plaintiff prior to her filing of her action, the defendant represented that it did receive a letter from counsel for a different individual, the latter of whom was a named plaintiff in a separate lawsuit against the defendant pending in a different federal district court. *Id.* at *3. Such letter was received before the plaintiff in *Vizcarra* filed suit. *Id.* Notably, such letter stated that the named plaintiff in the separate lawsuit against the defendant sought to notify the defendant, on his own behalf "and on behalf of others similarly situated" regarding the defendant's misleading marketing conduct and his intention to bring class claims if the defendant failed to remedy the CLRA violations. *Id.* Although the defendant argued that such letter could not be relied upon by the plaintiff in *Vizcarra* because such letter did not provide the defendant with notice of the plaintiff's demands in *Vizcarra* or with an opportunity to try to resolve her claims, the court disagreed:

> "The Court concludes that the letter that [Defendant] received from Steve Nunez prior to the filing of this lawsuit satisfies the notice requirements of section 1782(a) with respect to the CLRA damages asserted in the complaint."

*Vizcarra*, 2020 WL 4016810, at *3. The court explained:

> "Here, contrary to Unilever's assertions, Nunez's letter provided Unilever with notice, not only of his individual claims, but of the claims he sought to assert on behalf of other similarly situated consumers who purchased Unilever's vanilla ice cream products from January 1, 2014, to the present. That class of consumers includes Vizcarra, who alleges to have purchased Breyers Natural Vanilla Ice Cream during that time period.…It also includes the members of the proposed class of California consumers that Vizcarra seeks to represent in this action, who purchased the ice cream in question from April 21, 2016, to the present.…Further, Nunez's letter provided Unilever with an opportunity to resolve the claims of consumers similarly situated to Nunez, which, again, included Vizcarra and the

> members of the proposed class in this action. Unilever could have resolved the class claims by performing the actions required in section 1782(c). Because Nunez's letter provided Unilever with the opportunity to resolve the individual and proposed class claims for damages under the CLRA asserted here, such claims cannot be dismissed for failure to comply with section 1782(a)."

*Id. Vizcarra* also rejected the defendant's argument that the letter could not provide notice to the defendant of the plaintiff's claims in *Vizcarra* because no class had been certified as follows:

> "Section 1782(c) does not require that a class be certified before notice under section 1782(a) can be provided on behalf of a class of consumers; nor does it require that a class be certified before the person who receives a demand letter on behalf of a class of consumers can resolve the class claims by following the procedures set forth in that statute."

*Id.* at *4. *Vizcarra* then found support for its holding based upon section 1760 of the California Civil Code, which provides that the CLRA "shall be liberally construed and applied to promote its underlying purposes, which are to protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protection." (Cal. Civ. Code § 1760.) *Vizcarra* explained:

> "Interpreting section 1782(a) as requiring each consumer similarly situated to Nunez to serve Unilever with his or her own demand letter, as Unilever urges the Court to do, would be contrary to the text and purpose of that statute, as discussed above, and it would also contravene section 1760's requirement that the CLRA be construed and applied in a manner that 'provide[s] efficient and economical procedures to secure [the CLRA's] protections.'"

*Id.* at *4.

Notably, *Vizcarra* then expressly distinguished *Victor v. R.C. Bigelow, Inc.*, 2014 WL 1028881, at *19 (N.D. Cal. Mar. 14, 2014), as follows:

"In *Victor v. R.C. Bigelow, Inc.*, No. 13-CV-02976-WHO, 2014 WL 1028881, at *19 (N.D. Cal. Mar. 14, 2014), the demand letter upon which the plaintiff relied was sent by a named plaintiff in an earlier-filed lawsuit more than a year before the lawsuit before the court was filed. The court found that this demand letter was insufficient under section 1782(a) on the ground that it was not provided to the defendant within thirty days of the filing date of the lawsuit pending before it. ***This opinion, however, did not address whether the demand letter in question had been sent by the named plaintiff in the earlier-filed lawsuit on behalf of a class of consumers that included the plaintiff. Accordingly, this opinion does not conflict with the findings and reasoning here as to Nunez's letter***."

*Vizcarra*, 2020 WL 4016810, at *4 (emphasis added).  Given that *Victor*, which is cited by Defendant's Memorandum, was expressly distinguished by *Vizcarra*, Defendant's failure to address *Vizcarra* is disingenuous.

"The purpose of the notice requirement of section 1782 is to give the manufacturer or vendor sufficient notice of alleged defects to permit appropriate corrections or replacements.... The clear intent of the [CLRA] is to provide and facilitate pre-complaint settlements of consumer actions wherever possible and to establish a limited period during which such settlement may be accomplished. This clear purpose may only be accomplished by a literal application of the notice provisions." *Outboard Marine Corp. v. Superior Court*, 52 Cal. App. 3d 30, 40-41 (1975), *quoted in Vizcarra*, 2020 WL 4016810, at *3.

Here, upon receipt of the CLRA notice, Defendant had to provide refunds to all California purchasers, including Plaintiff, in order to comply with the class settlement requirements of subdivision (c) of section 1782.  Given Defendant's failure to do so, whether Defendant would have received a CLRA notice identifying Plaintiff versus any other California purchaser would have been pointless.  The bottom line is that CLRA notice provided to Defendant is consistent with the statutory purposes underlying the notice requirement in section 1782(a).

### 2. The CLRA Notice Identifies the "Particular Alleged Violations" of Section 1770.

Although Defendant correctly points out that the CLRA notice attached as Exhibit 6 to the FAC does not set forth specific paragraph numbers of alleged violations within subdivision (a) of section 1770 of the Civil Code, this Court is bound to follow the published California appellate decision in *Lafferty v. Wells Fargo Bank*, 213 Cal. App. 4th 545, 566 (2013) (finding pre-notice sufficient even though specific CLRA sections were not invoked), unless there is convincing evidence that the California Supreme Court would decide the issue differently. *See also Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1023 (9th Cir. 2011) (holding that the plaintiff "expressly set forth the nature of the dispute" via CLRA notice), *abrogated on other grounds by Comcast Corp. v. Behrend*, 569 U.S. 27 (2013); *Colucci v. ZonePerfect Nutrition Co.*, 2012 WL 6737800, at *9 (N.D. Cal. Dec. 28, 2012) (finding sufficient notice when plaintiff's letter notified defendant that the alleged defect was the "use of allegedly synthetic or artificial ingredients in ... nutrition bars").  Neither of the two federal district court decisions cited by Defendant distinguished *Lafferty* or *Stearns*.

The CLRA notice clearly states that Defendant's Product contains "the false and misleading memory-related efficacy claims contained on the product label, packaging, and accompanying advertising."  (FAC Ex. 6; Doc. 17-6; Page ID #244.)  Given that the Product's labeling states, "HELPS SUPPORT MEMORY & FOCUS," (FAC ¶ 8), and Defendant's website states that the Product "supports memory, focus, and cognitive processing speed," (FAC ¶ 9), it should not have been difficult for Defendant to figure out what claims were at issue.  Any reasonable person in Defendant's position would have construed the CLRA notice as alleging the violation of paragraph (5) of subdivision (a) of section 1770 of the Civil Code by "[r]epresenting that goods … have … uses, benefits … that they do not have".  Given that the CLRA "shall be liberally construed and applied to promote its underlying purposes," (Cal. Civ. Code § 1760), the Court should hold that the CLRA notice sufficed.

### 3.     Plaintiff's Use of Fedex Substantially Complies.

Although Defendant challenges Plaintiff's use of Fedex to serve the CLRA notice,[8] the Court should hold that Plaintiff substantially complied by using Fedex, a common carrier, to serve Defendant especially because Defendant's service address was located out-of-state in the state of Texas.[9]  *Freeman v. Indochino Apparel, Inc.*, 443 F. Supp. 3d 1107, 1111 (N.D. Cal. 2020) (citing the CLRA demand "letters" as providing pre-suit notice even though one of which was delivered via Fedex); *Cf. Shein v. Canon U.S.A., Inc.*, 2009 WL 3109721, at *6 (C.D. Cal. Sept. 22, 2009) (finding that "by sending the demand letter to defendant's headquarters in New York that plaintiffs have served notice that ***substantially complies*** with the purposes of the notice requirement") (emphasis added); *id.* at *7 ("[T]he Court finds that ***strictly applying*** the plain language of section 1782(a) in this case would contravene the goals of the CLRA notice provision which is to facilitate remediation of consumer actions.") (emphasis added); *Jones v. Porsche Cars North America, Inc.*, 2015 WL 11995257, at *4 (C.D. Cal. Oct. 15, 2015) (citing *Shein*); *Fidelity Sound System, Inc. v. American Bonding Co.*, 85 Cal. App. 3d Supp. 13, 20 (1978) (evidence that document was actually received is sufficient to show substantial compliance with statute requiring mailing of preliminary bond notice by certified or registered mail).  If the Court disagrees, dismissal should be without prejudice to allow Plaintiff to cure the defect.  *Shein*, 2009 WL 3109721, at *4.

### J.     The Prayer for Punitive Damages Should Not Be Stricken.

The FAC alleges fraudulent and deceptive conduct in violation of the CLRA.  (FAC ¶¶ 8-19.)  Such allegations of wrongdoing raise a plausible inference of oppression, fraud, or malice.

---

[8] As a practical matter, attempts to deliver CLRA demand letters via certified mail and registered mail have been frequently defeated by refusing to accept receipt.  (Ferrell Decl. ¶ 2.)

[9] Fedex is faster and more secure than certified mail.  (Ferrell Decl. ¶ 3); *see* https://www.serveindex.com/serving-legal-documents-via-certified-mail-fedex-or-ups/#:~:text=Certified%20mail%20service%20is%20generally,paper%20needs%20to%20to%20be%20served (last visited Aug. 11, 2023).

Moreover, one can infer that such wrongdoing was committed by an officer, director, or managing agent as defined in Cal. Civ. Code § 3294(a).  In particular, Defendant's officers, directors, or managing agents either knew or should have known regarding the falsity of Defendant's labeling claims for the Product, but, nevertheless, continued to sell such Product without making any labeling or marketing changes ***even after receiving Plaintiff's pre-filing CLRA demand letter***.  (FAC ¶ 19) ("More than 30 elapsed without any response from Defendant agreeing to take any corrective action before Plaintiff commenced the instant action in the California Superior Court on March 29, 2023.").  Such letter, which was sent via Fedex, was dated December 14, 2022.  (FAC Ex. 6); *Barker v. Riverside County Office of Education*, 584 F.3d 821, 824 (9th Cir. 2009) ("we must draw inferences in the light most favorable to the plaintiff").

Notably, Defendant's analysis completely omits addressing the effect of paragraph 19 of the FAC as supporting Plaintiff's position.  Such omission speaks volumes.  The Court is required to treat all of the material allegations of the FAC as true for purposes of the instant Motion.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

### K.   Leave to Amend Should Be Granted.

If the Court is inclined to grant the instant Motion, this Court should grant Plaintiff leave to amend to file a Second Amended Complaint.

Dated:  August 14, 2023                    PACIFIC TRIAL ATTORNEYS, P.C.

                                           By: */s/ Scott J. Ferrell*
                                           Scott. J. Ferrell
                                           Attorney for Plaintiff

# CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Plaintiff, certifies that this brief contains 7,000 words, which complies with the word limit of L.R. 11-6.1.

Dated:  August 14, 2023

    */s/ Scott J. Ferrell*    
Scott J. Ferrell
